UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RANDY ABBAS,

                             Plaintiff,

    -against-

HESTIA TOBACCO, LLC; and DAVID SLEY,

                         Defendants.

No. 1:18-cv-05151-ENV-RER

**AMENDED COMPLAINT**

       Plaintiff RANDY ABBAS ("Abbas"), by his attorneys FisherBroyles, LLP, for his Amended Complaint, alleges:

       1.     This action is brought to recover on a loan made by Abbas in the principal sum of $1,000,000 (plus accrued interest, costs and attorneys' fees) to Defendant HESTIA TOBACCO, LLC ("Hestia") and personally guaranteed by Hestia's Founder and CEO Defendant DAVID SLEY ("Sley"), which is in default. Abbas has asserted claims for breach of the Amended and Restated Note executed by Hestia, breach of the Guaranty executed by Sley, breach of implied or quasi-contract, fraudulent inducement, promissory fraud (under California law which governs the Amended and Restated Note and Guaranty), and conspiracy to commit fraud.

## JURISDICTION AND VENUE

       2.     Abbas is an individual residing at 167 Huntington Street, Brooklyn, NY 11231, within the Eastern District of New York.

       3.     Upon information and belief, Hestia is a Nevada limited liability company, having its principle office for the conduct of business located at 530 Foster Street, Suite 531,

Durham, NC 27702.

4. Upon information and belief, Sley is an individual domiciled in the State of California with a residence located at 653 Indiana Avenue, Venice, CA 90291, and/or Santa Monica, California. According to his LinkedIn profile, Sley is the Founder and CEO of Hestia, and upon information and belief, is a principle shareholder or the sole shareholder of Hestia.

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as Abbas, on the one hand, and Defendants, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum of $75,000.

6. Venue is proper in this district pursuant to the forum selection clauses in the subject note and guaranty.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

### A. Defendant Hestia Purportedly Sought A Short-Term Loan

7. In or about May 8, 2018, Sley approached Abbas through an intermediary seeking a short-term loan for Hestia in the principal sum of $1,000,000, ostensibly for its tobacco business which was between cash payments.

8. Sley represented that Hestia would need the loan for only one month, at which time Hestia would make complete and full repayment with accrued interest.

9. Based upon these representations, Abbas agreed to loan Hestia the principal sum of $1,000,000.

10. Hestia thereupon drafted and delivered to Abbas a promissory note in the principal sum of $1,000,000, dated May 8, 2018, executed on behalf of Hestia by Sley as CEO of Hestia, with repayment to be made in full within 30 days – a maturity date of on or before June 8, 2018.

11.    Abbas thereupon wired $1,000,000 to Hestia's bank account on May 9, 2018.

12.    Three days later, on or about May 12, 2018, Sley became married and thereupon spent 10 days on a honeymoon in Bora Bora. As explained in detail below, notwithstanding that the loan was made by Abbas to Hestia as evidenced by the promissory note created and executed by Hestia, and that Abbas was told and understood that it was a loan made to Hestia for Hestia's business purposes, Abbas did not discover until after the ultimate default on the loan, described in detail below, that neither Hestia nor Sley ever intended that Hestia would be the beneficiary of any of the funds represented by the promissory note. Indeed, upon information and belief, at all relevant times the intention of Hestia and Sley was that Sley would use these funds for his own personal benefit and the benefit of his new wife to pay for their wedding and honeymoon - a fact that Abbas did not discover until after the ultimate default on the loan, described in detail below.

13.    Besides breaching the relevant loan and guaranty documents by failing and refusing to make repayment of the $1,000,000 loan, Hestia and Abbas, jointly and severally, conspired to and did perpetrate a fraud upon Abbas, as well as upon creditors of Hestia, by falsely promising that Hestia would repay the loan and intentionally improperly diverting the loan funds to the personal use of Sley and his wife.

**B.  Defendant Hestia Defaults On The Loan**

14.    Hestia failed to repay the loan on or before the maturity date, June 8, 2018.

15.    On the maturity date, Sley represented to Abbas in an email that his funds were not at risk but that Hestia could not make repayment on that date because of a delay in the purported underlying Hestia corporate transaction:

> "As I think it's been mentioned, between incorporating in GC, opening up a GC acct w BNP Paribas, syndicating the mitigated insured risk of the PO through Lloyd's of London w the Busch crew (Hestia's financiers for this project), etc - my lawyers and accountants haven't finished. They said they

3

would. They haven't. The contracts are signed and your assets aren't at risk, but they're not in your acct, and that's on me. As of midnight tonight, I'm out of time, and interest will continue accruing against Hestia Tobacco LLC at the maximum rate, per our contact, and of course I'll honor every cent of that."

16.     On June 11, 2018, Sley represented that he had a call with respect to Hestia's underlying corporate transaction, and stated: "I expect to come back to you with a Fed ref # from that. And if not, a specific red line number of days (as in, 3 or 4) it will take them to finish," and on June 12, 2018 claimed that repayment of the $1,000,000 loan by Hestia would be made on June 14, 2018, or June 15, 2018.

17.     On June 15, 2018, Sley claimed to Abbas in an email that the broker in the underlying Hestia corporate transaction was "standing by with funds" but had not yet received information to open a bank account needed to wire the funds.

"Just got off the phone with the Busch fam ofc - they are standing by with the funds but hadn't received any acct opening info from BNP, so funds are still with them. Trying to see where the communication dropped, and get this wire set up for you."

18.     On June 20, 2018, Sley claimed in an email to Abbas that payment from Hestia would be made "with absolute certainty" by July 1, 2018, and stated that if Hestia could not make repayment from its underlying corporate transaction, Sley would "have to make the call to my parents."

"Thus far, I have passed along and relied upon the information given to me, and that's led to my failing to deliver multiple times. Third-world dealings, etc. My problem. Not yours. It's my understanding that it's been a mix of Ramadan delays in Morocco regarding documentation / certification (which just ended Friday), my lead investor, Daniel Hahn hosting this Mayshad Festival in Marrakech (the one I invited you to, Daniel) — and being difficult to reach, and just a general breakdown in communication.

If I were to continue passing along this information, I'd tell you Thursday, which is what Jacob Busch, the family liaison overseeing this, told me yesterday.
So, here's what I CAN say with absolute certainty — By July 1, I'll have our

4

account settled in full, either through this funding, or I'll have to make the call to my parents."

## C. Sley Lies About The Delay In Payment And Falsifies Bank Communications

19.     On July 6, 2018, Sley emailed Abbas that he had been silent for the previous weeks to "avoid a lack of candor" – *i.e.*, to avoid lying to Abbas.  In attempting to confirm that there was indeed an underlying Hestia corporate transaction from which the loan from Abbas would be repaid, Sley sent to Abbas corporate documents purporting to explain Hestia's underlying corporate transaction:

> "I've enclosed the 3 most pertinent documents backing up your money.
> 1)  a 55MM USD Purchase Order from Habanos S.A. to my company, Hestia Tobacco LLC
>
> 2)  The executed Agreement between Hestia and Habanos for 11MM in volume per month
>
> 3)  The executed Agreement between Hestia and Daniel Hahn, acting on behalf of his investment vehicle, to provide initial funding to fulfill the aforementioned PO and ongoing Agreement."

20.     On a telephone call later that day, July 6, 2018, Sley was asked to answer the question whether "if funding doesn't come from existing creditor (Daniel Hahn), what are the options and timelines? At what point do Sley's parents provide funding?" On that telephone call, Sley represented and confirmed to Abbas that the funds were being used for Hestia business purposes and that the delay in repayment was based on the other side delaying payment to Hestia. Sley said that he felt embarrassed and that he would ask his father to pay the debt on Hestia's behalf.

21.     On July 10, 2018, Sley emailed Abbas that he was "[a]waiting my father's wire to

clear" Hestia's account at JPMorgan Chase ("JPM") and on July 11, 2018, Sley emailed Abbas

that he had received a wire from his father and was waiting for the wire transfer to clear, and that

he would then make a wire transfer payment to Abbas.

22. On July 11, 2018, Sley emailed Abbas again, this time claiming that he had

attempted to send a wire transfer to Abbas, but that because he did this before his father's wire

transfer had cleared Hestia's bank account, JPM's fraud department therefore stopped the wire

transfer out of a concern for fraud. He attached what was later discovered to be an altered

"screenshot" of his purported bank balance of $1,601,445.654 which purported to show that

Sley's father had wired into Hestia's bank account sufficient funds to repay Abbas.

23. On July 17, 2018, Sley sent to a colleague of Abbas an email containing a false

and fraudulent federal reference number within a falsified confirmation email purporting to come

from JPM's official email address. Apparently, Sley had altered and "customized" the standard

Chase wire confirmation receipt to conform to Abbas' information.

24. Sley sent to Abbas' colleague on July 20, 2018 what Abbas later confirmed with

the bank to be a new, false federal reference number. That number was completely different

from the July 17, 2018 federal reference number.

25. Abbas made daily inquiries to his own bank, Citibank, from July 11, 2018 until

July 25, 2018 and at no time was there evidence of a wire transfer made by Hestia.

**D. Sley Admits That His Delay Was A "Rudimentary Fiction To Buy Time" And Claims To Be "Ashamed and Embarrassed"**

26. On July 25, 2018, Sley emailed Abbas and explained that after July 6th he called

his father to explain his "predicament" and "the difficulties caused by the Busch family office

delays." Sley said that his father "said he needed the weekend to think it over and discuss the

situation with my mother. On Monday he said he would begin selling the necessary stocks to initiate this. Tuesday, he backtracked. I can only imagine my mother got to him."

27.     He then stated that "Accordingly, my delays for the past 2 weeks have been a rudimentary fiction to buy time. I remain ashamed and embarrassed of my actions. I make no excuse." Sley then resurrected "the Busch family" as a purported source of repayment:

> "Funding from the Busch family finally arrived into our BVI SVP last Friday, July 20, and I immediately re-submitted our promissory note, along with the request to wire the funds to you, as they maintain a modicum of oversight through these primary stages. And they have said they would attend to the request ASAP."

28.     Sley continued to represent that Hestia had every intention of repaying the loan to Abbas, from two different identifiable sources. Abbas therefore sent to him, on August 9, 2018, an "Amended and Restated Promissory Note" for Hestia ("Amended Note") which extended the maturity date. He also sent to Sley a "Guaranty Agreement" to be executed by Sley, in which he personally guaranteed payment by Hestia on the Amended Note ("Guaranty").

### E. Amended and Restated Promissory Note and Guaranty Agreement And Default By Defendants

29.     On August 10, 2018, Sley returned to Abbas the Amended Note executed by Sley on behalf of and as CEO of Hestia, and the Guaranty executed by Sley. A true and complete copy of the executed Amended Note is annexed hereto as Exhibit A. A true and complete copy of the executed Guaranty is annexed hereto as Exhibit B.

30.     The Amended Note, dated August 10, 2018, provided, *inter alia*, that:

The maturity date for repayment of principal and all accrued and unpaid interest on the $1,000,000 loan was "five (5) business days after the date of this Note," *i.e.*, August 17, 2018.

The entire unpaid principal balance and accrued and unpaid interest shall bear an annual interest rate of 10%.

The Amended Note and its performance was to be guaranteed by Sley.

7

Nonpayment of the principal and/or interest under the Amended Note on the maturity date would be deemed an event of default.

Hestia is obligated to pay costs, expenses and attorneys' fees paid or incurred by Abbas in any effort to collect or enforce on the Amended Note, including without limitation, litigation.

The Amended Note shall be governed by and construed in accordance with the laws of the State of California.

Hestia agreed to submit to personal jurisdiction in the State of New York in any litigation to collect or enforce on the Amended Note, and agreed that any such litigation shall exclusively be brought in any state or federal court of competent jurisdiction in the State of New York, within the City of New York.

31.     The Guaranty, dated August 10, 2018, provided, *inter alia*, that:

Sley's liability under the Guaranty is primary and unconditional.

Sley guaranteed the prompt payment and timely enforcement of all liabilities, obligations and duties imposed upon Hestia under the terms of the Amended Note, as fully and to the same extent as if he had executed the Amended Note as Hestia thereunder.

Sley waived, among other things, notice of default by Hestia under the Amended Note.

Sley agreed that Abbas shall not be first required to enforce against Hestia any liability, obligation or duty guaranteed before seeking enforcement thereof against Sley.

Sley guaranteed that if Abbas shall engage an attorney to present, enforce or defend his rights and remedies under the Guaranty, then Sley shall pay any reasonable attorneys' fees, related legal expenses and costs of court incurred by Abbas in connection therewith.

Sley shall not be entitled to make any defense against any claim asserted by Abbas in any litigation to enforce the Amended Note or Guaranty, and expressly waived any defense in law or equity that is not nor would not be available to Hestia.

Sley's obligations shall not be subject to any counterclaim, set-off, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense based upon any claim he may have against Abbas or any other person.

The Guaranty shall be governed by and interpreted under the laws of the State of California. Exclusive venue for any action arising out of the Guaranty shall be the state and federal courts situated in the City of New York.

32.     Hestia failed and refused to make payment under the Amended Note at the

maturity date - five (5) business days after the date of the Amended Note, *i.e.*, August 17, 2018 – which constituted an event of default under the Amended Note.

33.     Sley failed and refused to make payment under the Guaranty at the maturity date five (5) business days after the date of the Amended Note, *i.e.*, August 17, 2018 – which constituted an event of default under the Guaranty.

34.     Despite oral and written demands for payment, although not conditions precedent for enforcement or collection under either the Amended Note or Guaranty, and although neither Hestia nor Sley had a right to cure the default, Hestia has failed and refused to make payment under the Amended Note, and Sley has failed and refused to make payment under the Guaranty.

35.     There is now due and owing from Defendants, jointly and severally, the principal sum of $1,000,000 plus interest, costs and expenses, and legal fees.

### F.   Sley's Fraudulent Inducement in Procuring The Loan is Discovered

36.     After the default by Hestia and Sley under the Amended Note and Guaranty, Abbas discovered that neither Hestia nor Sley ever had any intention that Hestia would receive or utilize the proceeds of the $1,000,000 loan funds for any purpose, as Sley had represented. Instead, at all relevant times, Defendants intended that the proceeds of the $1,000,000 loan funds were to be used *personally* by Sley to pay for the expenses incurred by he and his wife for their wedding and honeymoon.

37.     After the default by Hestia and Sley under the Amended Note and Guaranty, Abbas discovered a May text message from Sley to Abbas' colleague, that Sley stated that, with respect to the loan of $1,000,000, "I need it in JPM to pay f _ _ _ ing wedding vendors ASAP." As to how the loan would be repaid, Sley represented that if the "Busch family," with which Sley purportedly had conducted some business, "breaches their contract [] [a]t which point I can sue

for non-performance. And frankly, at which point I would hit up my dad and explain the situation."

38.     Upon information and belief, Sley fraudulently represented that Hestia needed the $1,000,000 loan for legitimate business purposes, and executed the original promissory note on behalf of Hestia in order to fraudulently induce Abbas to extend the $1,000,000 loan to Hestia, and thereafter fraudulently represented to Sley that funds due and owing Hestia were imminently available for repayment of Abbas' loan in order to fraudulently induce Abbas to extend the maturity date of the loan and accept Hestia's Amended Note and his own personal Guaranty

39.     Upon information and belief, in June, July and August Sley repeatedly lied about and fraudulently misrepresented to Abbas the source of the funds from which Hestia would purportedly repay the loan and the events and occurrences that had to take place before the loan could be repaid, and sent to Abbas purported bank communications that he had fraudulently altered in order to induce Abbas to extend the maturity date under the Amended Note.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Breach of Contract by Hestia)

40.     Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein. pursuant to the Amended Note, Hestia was responsible for the payment and performance of all of its obligations, including full and complete payment.

41.     Hestia defaulted under the Amended Note and is therefore liable to Abbas in the principal sum of $1,000,000 plus applicable accrued interest plus costs, expenses and attorneys' fees paid or incurred by Abbas.

42.     By the terms of the Amended Note, Hestia waived all defenses to payment of the amounts due and owing under it.

43.     Hestia's failure and refusal to make repayment under the Amended Note constitutes a breach of the Amended Note.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### (Quasi-Contract/Quantum Meruit against Defendants)

44.     Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein.

45.     By their respective actions, Abbas and Defendants entered into an implied or quasi-contract whereby Abbas agreed to loan $1,000,000 to Defendants and Defendants agreed to repay the loan amount together with interest thereon.

46.     Defendants enticed and fraudulently induced Abbas into making the $1,000,000 loan through false and misleading representations regarding the identity of the borrower, the commercial use of the loan proceeds and the Defendants' repayment of the loan.

47.     Where, as here, a party or parties are unjustly enriched by the acquisition of property of another, the law creates a quasi-contractual obligation by the party unjustly enriched to compensate the owner of the property for the reasonable value of the property received.

48.     Defendants breached the implied or quasi-contract by refusing to repay to Abbas the principal amount of the loan and refusing to pay interest accrued thereon during the Defendants' use of the loan proceeds.

49.     Defendants would not have obtained the $1,000,000 loan from Abbas were it not for their wrongful conduct.

50.     Abbas has been harmed and has sustained damages by the Defendants' breach of the implied or quasi-contract. Having unjustly and wrongfully obtained Abbas' property, Defendants' continued retention of the $1,000,000 loan proceeds (and accrued interest thereon)

11

would be inequitable and unjust.

51. Equity and good conscience require that Defendants, jointly and severally, provide Abbas with fair and reasonable restitution in the amount in which they were unjustly enriched.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### (Breach of the Guaranty against Sley)

52. Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein.

53. Sley's liability under the Guaranty is primary and unconditional.

54. As set forth above in detail, under the Guaranty, Sley guaranteed the prompt payment and timely enforcement of all liabilities, obligations and duties imposed upon Hestia under the terms of the Amended Note, as fully and to the same extent as if he had executed the Amended Note as Hestia thereunder.

55. As set forth above in detail, under the Guaranty, Sley agreed that Abbas shall not be first required to enforce against Hestia any liability, obligation or duty guaranteed before seeking enforcement thereof against Sley.

56. Hestia defaulted under the Amended Note and Sley defaulted under the Guaranty, and Sley is therefore liable to Abbas under the Guaranty in the principal sum of $1,000,000 plus applicable accrued interest plus costs, expenses and attorneys' fees paid or incurred by Abbas.

57. Sley's failure and refusal to make payment under the Guaranty constitutes a breach of the Guaranty.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### (Fraud in the Inducement against Defendants)

58. Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein.

59. As set forth in detail above, Defendants, jointly and severally, made knowing and false representations to Abbas about the loan, the identity of the true borrower, the disposition of the loan proceeds, and the intention and source of funds to repay the loan and comply with the terms of the Amended Note and Guaranty, with the intent to deceive him and/or to induce reliance by him.

60. In justifiable reliance upon the knowing and false representations, Abbas was damaged by making a $1,000,000 loan to Hestia.

61. Hestia's failure and refusal to make repayment under the Amended Note, and Sley's failure and refusal to make repayment under the Guaranty constitutes fraud.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### (Promissory Fraud against Defendants)

62. Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein.

63. As set forth in detail above, Defendants, jointly and severally, made knowing and false representations to Abbas that the loan was to be made to Hestia and would be repaid by Hestia, with the intent to deceive him and/or to induce reliance by him, and in justifiable reliance upon the knowing and false representations Abbas was damaged.

64. Upon information and belief, Hestia had no intention of repaying the loan to Abbas.

13

65. Hestia's failure and refusal to make repayment under the Amended Note, and Sley's failure and refusal to make repayment under the Guaranty constitutes promissory fraud under the California law governing enforcement and collection under the Amended Note and the Guaranty.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

### (Conspiracy to Commit Fraud By Defendants)

66. Abbas repeats and realleges each of the preceding paragraphs as if fully set forth herein.

67. As set forth in detail above, Defendants, jointly and severally, and in concert and conspiracy, made knowing and false representations to Abbas with the intent to deceive him and/or to induce reliance by him, that the loan was to be made to Hestia and would be repaid by Hestia.

68. In justifiable reliance upon the knowing and false representations, Abbas was damaged.

69. Defendants' knowing and false representations to Abbas made in concert constituted conspiracy to commit fraud against Abbas.

**WHEREFORE,** Abbas respectfully requests that judgment be entered in his favor against Defendants, jointly and severally, with respect to each and every Claim for Relief, in the principal sum of $1,000,000 plus applicable accrued interest plus costs, expenses and attorneys' fees paid or incurred by him, plus punitive damages on the Fourth, Fifth, and Sixth Claims for Relief in the amount of $5,000,000, plus such other and further relief as this Court may deem just and proper.

Date: December 20, 2018
New York, New York

FISHERBROYLES LLP

By: _____

Richard B. Cohen, Esq.
Christina H. Bost Seaton, Esq.
445 Park Avenue, Ninth Floor
New York, New York 10022
(221) 247-6122
Richard.Cohen@fisherbroyles.com
Christina.BostSeaton@fisherbroyles.com
*Attorneys for Plaintiff*

# EXHIBIT A

## AMENDED AND RESTATED PROMISSORY NOTE

**$1,000,000.00**                                                                August 10, 2018

This Amended and Restated Promissory Note (this "**Note**") is entered into on the date first set forth above by and between Hestia Tobacco, LLC, a Nevada limited liability company ("**HT**"), and Randy Abbas, an individual ("**RA**").

### RECITALS

WHEREAS, the parties signed a previous promissory note dated May 8, 2018, wherein RA lent $1,000,000 to HT with a due date of June 7, 2018 (the "**Original Note**");

WHEREAS, the parties desire to extend the time for HT to repay the loan amount and further desire to re-state the interest due on the $1,000,000 face amount of the Original Note; and

WHEREAS, in consideration for extending the due date on the Original Note, the parties hereto intend to supersede and replace the Original Note with this Note.

### AGREEMENT

NOW THEREFORE, intending to be legally bound and for good and valuable consideration, including extending the term of the promissory note, the parties agree as follows:

1.     **Loan**. HT promises to pay to RA at 167 Huntington Street, Brooklyn, NY 11231, or such other address as may be directed by RA in writing, the principal sum of $1,000,000.00 or so much thereof as may be outstanding, together with all accrued and unpaid interest thereon.

2.     **Payment of Principal and Interest**. The principal and all accrued and unpaid interest thereon shall be due and payable five (5) business days after the date of this Note (the "**Maturity Date**"). All payments of principal and interest of this Note shall be payable in lawful currency of the United States of America.

3.     **Credit of Payments**. The payment under this Note shall be credited in the following order: (a) costs, fees, and charges paid or incurred by RA and for which HT is obligated under the terms herein; (b) interest payable under this Note; and (c) principal under this Note.

4.     **Interest**. The entire unpaid principal balance and accrued and unpaid interest shall bear an annual interest rate equal to the lesser of: (a) ten percent (10%) per annum or (b) the maximum interest rate allowed by law in lieu of the rate provided above herein. Interest owing for each year shall be calculated on the basis of a fraction the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed from the first day of such year.

5.     **Guaranty**. This Note and the performance by HT of all of its obligations hereunder is secured by the personal guarantee (the "**Guaranty**") of David Sley (the "**Guarantor**")

6.     **Event of Default**. The occurrence of any of the following events will be deemed to be an "**Event of Default**" under this Note: (a) the nonpayment of the principal, interest or other indebtedness under this Note on the Maturity Date; (b) the occurrence of any event of default or default and the lapse of any notice or cure period under any other debt, liability or obligation to the Lender; (c) the filing by or

against HT or the Guarantor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against HT or the Guarantor, such proceeding is not dismissed or stayed forty-five (45) days of the commencement thereof; (d) any assignment by HT for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property that HT held; (e) a default with respect to any other indebtedness of either HT to the Guarantor for borrowed money that is not cured within any notice or cure period; or (f) the entry of a final judgment against either HT or the Guarantor and the failure of HT to discharge the judgment within ten (10) days of the entry thereof. Upon the occurrence of any Event of Default, the entire unpaid principal sum hereunder plus all interest accrued thereon plus all other sums due and payable to RA under this Note, in addition to all attorneys' fees incurred by RA in connection with HT's default under the Original Note (as defined below), shall automatically become due and payable immediately. In addition to the foregoing, upon the occurrence of any Event of Default, RA may forthwith exercise individually, concurrently, successively or otherwise any and all rights and remedies available to RA under the the Guaranty, or available to Lender by law, equity, statute or otherwise.

7.     **Attorneys' Fees**. HT agrees to pay the following costs, expenses, and attorneys' fees paid or incurred by RA, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and attorneys' fees paid or incurred in connection with the collection or enforcement of the Original Note and this Note, whether or not suit is filed; (b) reasonable costs, expenses, and attorneys' fees paid or incurred in connection with representing RA in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Note; and (c) costs of suit and such sum as the court may adjudge as attorney fees in any action to enforce payment of this Note or any part of it.

8.     **Waiver**. HT, endorsers, and all other persons liable or to become liable on this Note waive presentment, protest, and demand; notice of protest, demand, and dishonor; and all other notices or matters of a like nature.

9.     **Forbearance Not a Waiver**. If RA delays in exercising or fails to exercise any of its rights under this Note, then that delay or failure shall not constitute a waiver of any RA rights or of any breach, default, or failure of condition under this Note. No waiver by RA of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by RA.

10.     **Assignment**. This Note inures to and binds the heirs, legal representatives, successors, and assigns of HT and RA.

11.     **Severability**. If any provision of this Note, or the application of it to any party or circumstance, is held void, invalid, or unenforceable by a court of competent jurisdiction, the remainder of this Note, and the application of such provision to other parties or circumstances, shall not be affected thereby, the provisions of this Note being severable in any such instance.

12.     **Time is of the Essence**. Time is of the essence with respect to all obligations of HT under this Note.

13.     **Notices**. All notices required to be given to any of the parties hereunder shall be in writing, and shall be deemed to have been sufficiently given for all purposes when presented personally to such party, or sent by certified or registered mail, return receipt requested, or sent by a nationally recognized next day delivery service, to such party at its address set forth below:

RA:    Randy Abbas
       167 Huntington Street
       Brooklyn, NY 11231

HT:    Hestia Tobacco LLC
       Attention: David Sley
       530 Foster Street, Suite 531
       Durham, NC 27701

14.    **Governing Law**. This Note shall be governed by and construed in accordance with the laws of the State of California.

15.    **Submission to Jurisdiction and Venue**. HT, to the fullest extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, (a) submits to personal jurisdiction in the State of New York over any suit, action or proceeding by any person arising from or relating to this Note, (b) agrees that any such action, suit or proceeding shall exclusively be brought in any state or federal court of competent jurisdiction over the State of New York, (c) submits to the jurisdiction of such courts, and (d) to the fullest extent permitted by law, HT agrees that it will not bring any action, suit or proceeding in any venue other than in the City of New York. HT further consents and agrees to service of any summons, complaint or other legal process in any such suit, action or proceeding by registered or certified U.S. mail, postage prepaid, to HT at the address for notices described in Section 13 hereof, and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

*[Signature Page Follows]*

IN WITNESS WHEREOF, HT has executed this Note as of the day and year first written above.

**HT**

HESTIA TOBACCO, LLC

By: _____
    Name: David Sley
    Title: CEO

**RA**

_____
Randy Abbas

4849-4731-9919, v. 1

# EXHIBIT B

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "**Guaranty**"), dated as of August 10, 2018, is executed and delivered by David Sley, an individual ("**Guarantor**"), to and for the benefit of Randy Abbas, an individual ("**RA**").

WHEREAS, RA has entered into, or will enter into, a certain Amended and Restated Promissory Note (the "**Note**") with Hestia Tobacco, LLC, a Nevada limited liability company ("**HT**"), for that certain loan for $1,000,000.00, which amends and restates the Promissory Note, dated May 8, 2018, by HT in favor of RA (the "**Original Note**"); and

WHEREAS, in order to induce RA to delay taking any action with respect to HT's default on the Original Note, Guarantor desires to execute and deliver this Guaranty to and for the benefit of RA.

NOW, THEREFORE, for and in consideration of the premises, and of other good valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by Guarantor, Guarantor does hereby agree as follows:

1.      Guarantor has guaranteed, and by this Guaranty does hereby guarantee, the prompt payment and timely performance of all liabilities, obligations and duties imposed upon HT under the terms of the Note, as fully and to the same extent as if Guarantor had executed the Note as HT thereunder.

2.      Guarantor hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by RA under the Note, and waives diligence, presentment and suit on the part of RA in the enforcement of any liability, obligation or duty guaranteed hereby.

3.      Guarantor further agrees that RA shall not be first required to enforce against HT or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against Guarantor. Suit may be brought and maintained against Guarantor by RA to enforce any liability, obligation or duty guaranteed hereby without joinder of HT or any other person. The liability of Guarantor hereunder shall not be affected by any indulgence, compromises, settlement or variation of terms which may be extended to HT by RA or as may otherwise be agreed upon by RA and HT, and shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of HT, or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Code, or any similar law or statute of the United States, or of any state thereof. HT and RA, without notice to or consent by the Guarantor, may at any time or times enter into such extensions, amendments, assignments, subleases or other covenants with respect to the Note as they may deem appropriate, and the undersigned Guarantor shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of HT under the Note as so extended, amended, assigned or otherwise modified.

4.      Guarantor agrees that, if RA shall engage an attorney to present, enforce or defend RA's rights or remedies hereunder, then Guarantor shall pay any reasonable attorneys' fees, related legal expenses and costs of court incurred by RA in connection therewith.

5.     This Guaranty shall be binding upon Guarantor and the heirs, legal representatives and successors of Guarantor, and shall inure to the benefit of RA and RA's heirs, legal representatives, successors and assigns.

6.     Guarantor shall not be entitled to make any defense against any claim asserted by RA in any suit or action instituted by RA to enforce this Guaranty or the Note or to be excused from any liability hereunder that HT could not make or invoke, and Guarantor hereby expressly waives any defense in law or in equity that is not or would not be available to HT, it being the intent hereof that the liability of Guarantor hereunder is primary and unconditional.

7.     Guarantor covenants and agrees that Guarantor shall not divest any or all of his ownership interest in, or suffer or permit any change in control of, HT; nor shall Guarantor sell, lease, transfer, assign or convey any of Guarantor's material assets unless Guarantor shall receive adequate consideration therefor and only if such transaction will not have a material adverse effect on the financial condition of Guarantor.

8.     Guarantor acknowledges and agrees that Guarantor was materially involved in the negotiation of the Note and hereby covenants and agrees to abide by those provisions of the Note applicable to Guarantor.

9.     It is fully understood that, until each and every one of the covenants and agreements of this Guaranty is fully performed, Guarantor's obligations hereunder shall not be released, in whole or in part, by any action or thing that might, but for this Section 9, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, extension, renewal, modification, forbearance or delay or any other act or omission of RA or its failure to proceed promptly or otherwise or by reason of any action taken or omitted by RA, whether or not such action taken or omitted by RA, whether or not such action or failure to act varies or increases the risk of, or affects the rights or remedies of, Guarantor, and Guarantor hereby expressly waives and surrenders any defense to Guarantor's liability hereunder based upon any of the foregoing acts, omissions, things, agreements or waivers of any of them, it being the purpose and intent of the parties hereto that the covenants, agreements and all obligations of Guarantor hereunder are absolute, unconditional and irrevocable. An assignment of the Note, whether permitted or otherwise, shall not affect the obligations of Guarantor hereunder,

10.     If it shall be asserted that HT's obligations are void or voidable due to illegal or unauthorized acts by HT in the execution of the Note, then Guarantor shall nevertheless be liable hereunder to the same extent as Guarantor would have been if the obligations of HT had been enforceable against HT.

11.     The obligations of Guarantor shall not be subject to any counterclaim, set-off, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense based upon any claim Guarantor may have against HT or any other person.

12.     This Guaranty shall be governed by and interpreted under the laws of the State of California. Exclusive venue for any action arising out of this Guaranty shall be the state and federal courts situated in the City of New York.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Agreement has been executed on the day and year first above written.

GUARANTOR

David Sley

RA

Randy Abbas